**G.M., By and Through His Guardian and Next Friend, R.F., Plaintiff–Appellant,**

v.

**NEW BRITAIN BOARD OF EDUCATION, Defendant–Appellee.**

**Docket No. 98–7636.**

United States Court of Appeals, Second Circuit.

Argued March 18, 1999.

Decided April 12, 1999.

David C. Shaw, Hartford, Conn., for Plaintiff–Appellant G.M.

Richard J. Buturla, Berchem, Moses & Devlin, P.C., Milford, Conn., for Defendant–Appellee New Britain Board of Education.

Before: McLAUGHLIN, CALABRESI, and GIBSON,\* Circuit Judges.

CALABRESI, Circuit Judge:

Plaintiff-appellant G.M., by and through his guardian and next friend, R.F., appeals from a decision of the United States District Court for the District of Connecticut (Alfred V. Covello, *Chief Judge* ) granting summary judgment to defendant-appellee New Britain Board of Education (the "Board"). G.M.'s suit against the Board seeks to recover attorney fees and costs that G.M.'s representatives incurred in the course of an administrative proceeding brought under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400–1491*o* (1994), to challenge

the adequacy of the special education program that the Board offered G.M. The district court found that G.M. was not a "prevailing party" in the administrative proceeding and therefore could not receive costs or attorney fees. Because the record does not support the district court's conclusion, we reverse.

## BACKGROUND

During the time relevant to his action, G.M. was a seventeen-year-old student at New Britain High School, which is operated by the Board. Because G.M. has learning disabilities, the Board has provided him with various special education services. Beginning in September 1995, the Board contracted with Futures, Inc. ("Futures"), to furnish some of these.

Under the IDEA, G.M.'s planning and placement team ("PPT") is charged with developing an individual education plan ("IEP") that tailors G.M.'s educational services to his needs. *See* 20 U.S.C. § 1414(d)(1)(B) (Supp.1998). G.M.'s PPT includes one of his teachers, his advocate (an employee of the State of Connecticut's Office of Protection and Advocacy for Persons with Disabilities), his probation officer, a pupil services coordinator, a representative from Futures, and an attorney representing the Board who attended some of the meetings.

In February 1996, Futures suggested that G.M.'s educational plan be modified to emphasize "transitional planning ... with a focus on community-based goals and objectives." Subsequently, during a regular PPT meeting in April, G.M.'s advocate, Bruce Garrison, requested that the PPT modify G.M.'s IEP to implement a more community-based approach. At the time, the IEP included fifteen hours of special education at his high school each week and ten hours of vocational exploration in the community, provided by Futures. When

---

\* The Honorable John R. Gibson, Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

G.M.'s teacher stated that he thought that G.M.'s school situation was improving, Garrison disagreed and requested an independent evaluation of G.M.'s educational needs. The Board's attorney refused to approve an independent evaluation until G.M.'s family showed that such an evaluation was needed. At the conclusion of the meeting, the PPT, with Garrison dissenting, decided that the current IEP was appropriate to G.M.'s needs.

In May, Futures submitted a proposal for a "Community–Based Alternative Curriculum" that was designed to help G.M. acquire basic work and social skills, a work ethic, and independent living skills. At the next PPT meeting, held in June, Garrison voiced his opinion that, unless this Futures proposal were adopted, G.M.'s IEP would remain inadequate. The PPT instead chose what it called an "adaptation" of the Futures proposal. This increased G.M.'s hours in Futures' vocational exploration program to fifteen per week, but still kept G.M. at the high school for fifteen hours. In July, Garrison, on behalf of G.M.'s guardian, requested a full administrative ("due process") hearing to address "the Board['s] refusal to approve an independent evaluation[ and G.M.'s guardian's] disagree[ment] with [his] current placement and IEP."

The hearing began in September, but was adjourned when G.M.'s guardian and the Board reached an agreement to have Futures conduct an independent evaluation of G.M.'s educational needs. The Futures evaluation, completed in October, recommended a community-based educational program with characteristics similar to those of the May Futures proposal that the PPT had rejected in June. Later in October, the Board and G.M.'s guardian stipulated "to implement the recommendations contained in the independent evaluation." The hearing officer accepted the stipulation as the final decision in the case, retaining jurisdiction for ninety days to resolve any disagreements arising out of the stipulation.

In November, G.M. filed this action in the district court seeking costs and attorney fees incurred in the administrative proceeding. The Board and G.M. submitted cross-motions for summary judgment. The district court granted the Board's motion and denied G.M.'s motion. This appeal followed.

## DISCUSSION

### A. Standard of Review

■ In general, "[w]e review a district court's ruling on attorneys' fees for abuse of discretion." *McCardle v. Haddad,* 131 F.3d 43, 53 (2d Cir.1997); *see also W.G. v. Senatore,* 18 F.3d 60, 63 (2d Cir.1994) (noting same, in an IDEA case). Under the abuse of discretion standard, a district court's decision " 'cannot be set aside by a reviewing court unless it has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors.' " *Carroll v. American Fed'n of Musicians,* 295 F.2d 484, 488 (2d Cir.1961) (quoting *In re Josephson,* 218 F.2d 174, 182 (1st Cir.1954)). Because the district court decided this case at the summary judgment stage, however, we also must reverse its decision if it required the resolution of any genuinely disputed material fact. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### B. Merits

The IDEA ensures "all children with disabilities ... a free appropriate public education that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d) (Supp.1998). If the guardian of a child with a disability successfully enforces his or her rights under the IDEA in an administrative action, the statute authorizes courts to award reasonable attorney fees to the guardian. *See id.*

§ 1415(i)(3)(B).[1] The district court held, however, that G.M. was not a "prevailing party" in the administrative proceedings and therefore could not receive attorney fees and costs.

■ " '[P]laintiffs may be considered "prevailing parties" for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing the suit.' " *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 789, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989) (quoting *Nadeau v. Helgemoe*, 581 F.2d 275, 278–79 (1st Cir.1978)). "A plaintiff may be considered a prevailing party even though the relief ultimately obtained is not identical to the relief demanded in the complaint, provided the relief obtained is of the same general type." *Koster v. Perales*, 903 F.2d 131, 134–35 (2d Cir.1990). "[T]he most critical factor is the degree of success obtained." *Texas State Teachers Ass'n*, 489 U.S. at 789, 109 S.Ct. 1486.

■ In applying the prevailing party standard to IDEA cases, we have compared the relief sought by the plaintiff with the relief obtained as a result of the suit. *See, e.g., Christopher P. v. Marcus*, 915 F.2d 794, 804 (2d Cir.1990). Similarly, the Third Circuit has characterized the appropriate inquiry as a two-part test: "whether plaintiffs achieved relief and whether there is a causal connection between the litigation and the relief from the defendant." *Wheeler v. Towanda Area Sch. Dist.*, 950 F.2d 128, 131 (3d Cir.1991); *see also Koster*, 903 F.2d at 135 ("To justify a fee award, 'the prevailing party must show a causal connection between the relief obtained and the litigation in which the fees are sought.' " (quoting *Gerena–Valentin v. Koch*, 739 F.2d 755, 758 (2d Cir. 1984))). The Third Circuit's explanation of the "causal connection" element of this test is instructive and particularly relevant in assessing whether a plaintiff has "prevailed" in a case resolved by settlement:

Litigation is causally related to the relief obtained if it was a material contributing factor in bringing about the events that resulted in obtaining the desired relief. Litigation can be a material contributing factor if it changed the legal relations of the parties such that defendants were legally compelled to grant relief.

Alternatively, causation can be established through a "catalyst" theory, where even though the litigation did not result in a favorable judgment, the pressure of the lawsuit was a material contributing factor in bringing about extrajudicial relief.

*Wheeler*, 950 F.2d at 132 (internal citations omitted); *see also Koster*, 903 F.2d at 135 ("Such a causal connection exists if the plaintiff's lawsuit was 'a catalytic, necessary, or substantial factor in attaining the relief.' " (quoting *Gerena–Valentin*, 739 F.2d at 758–59)).

In assessing G.M.'s success in accomplishing his goals in requesting an administrative hearing, the district court characterized G.M.'s requested relief in very narrow terms: (1) an independent evaluation by a particular evaluator, Dr. Ernie Panscofar; and (2) an increase in G.M.'s vocational and community-based education to 20–25 hours per week. According to the district court, because the Board and G.M. stipulated to an independent evaluation by Futures rather than by Dr. Panscofar and because Futures' October 1996 recommendations (adopted in the settlement) did not expressly specify the number of hours G.M. was to spend in vocational and community-based programming, G.M. did not obtain the relief he had sought. The district court deemed the changes made in G.M.'s educational plan as a result of the stipulation to be limited and relatively minor.

#### 1. Independent Evaluation

■ As noted, the district court held that G.M. did not succeed in his request

---

**1.** At the time of the district court's decision, these provisions were codified in substantially the same form at 20 U.S.C. § 1400(c) and 20 U.S.C. § 1415(e)(4)(B), respectively.

for an independent evaluation because the court characterized G.M. as seeking an evaluation specifically to be performed by Dr. Panscofar. There are two problems with this conclusion: (1) the record is not clear as to whether G.M. had insisted on an independent evaluation specifically by Dr. Panscofar or, more generally, had sought an evaluation by someone other than a Board employee; and (2) even if G.M. did initially seek an evaluation specifically by Dr. Panscofar, the result G.M. obtained—an independent evaluation by Futures—nevertheless constituted substantial success toward his goal.

Whether G.M. conditioned his request for an independent evaluation on Dr. Panscofar being the evaluator is at least a disputed issue of fact that the district court should not have resolved at summary judgment. The minutes of the April 1996 PPT meeting do indicate that Garrison's initial demand was for "an independent evaluation by Dr. Ernie Panscofar." The Board answered this by "stat[ing] that the New Britain Schools have done this type of evaluation," to which Garrison responded in turn that "Dr. Panscofar focuses on 'transitional planning.'" Later in the meeting, the Board's attorney told Garrison that G.M.'s family "would need to prove that this type of evaluation is appropriate." When Garrison subsequently requested an administrative hearing to resolve the dispute, he referred generally to "the Board['s] refusal to approve an independent evaluation."

Thus, the record is not clear as to the nature of the disagreement between Garrison and the Board. Based on the minutes of the April PPT meeting, the most reasonable interpretation of the record is that G.M.'s representatives wanted an independent evaluation of G.M.'s needs, and that the Board was unwilling to pay for any outside evaluation. In any event, we find no basis for the district court's conclusion that—as a matter of law—G.M. sought an independent evaluation only by Dr. Panscofar.

But even if at the time that Garrison initiated the hearing process G.M.'s demand for an independent evaluation had been conditioned on the evaluation being performed by Dr. Panscofar, G.M. nonetheless obtained at least partial (and meaningful) success as a result of seeking a hearing. The minutes of the April PPT meeting show that the Board was resistant to *any* additional evaluation, and certainly to an evaluation not performed by the school system. The minutes also reflect that Garrison wanted the evaluation conducted by Dr. Panscofar because of Dr. Panscofar's focus on "transitional planning" as opposed to traditional educational programs. Futures emphasizes "transitional" education—one of Futures' letters in the record describes its "Alternative Educational Program" as "real-life learning opportunities within the student's community in the areas of employment, recreation, community participation, and functional academics." Thus, Futures meets the criterion that Garrison gave in April for picking Dr. Panscofar to evaluate G.M. Perhaps most telling, however, is that the stipulation agreed to by the Board in the settlement itself expressly identifies the Futures assessment of G.M. as an "independent evaluation."

Thus, G.M. might, at trial, have been able to show that his request for an evaluation was essentially for a review conducted by any validly independent evaluator, in which case his representatives obtained total success on this issue. But even if G.M. had at such a trial been found initially to have sought an evaluation specifically by Dr. Panscofar, the result of the settlement—"the independent evaluation" by Futures—was at least substantial success. It follows that, either way, the district court abused its discretion in holding that G.M. was not a prevailing party on this issue.

2. Community–Based Programming

■ The district court also exceeded its discretion in concluding that G.M. did not

achieve significant success regarding his goal of obtaining community-based programming. The court ruled that because the recommendations that Futures made in October 1996 "made no mention of the amount of hours [to be] spent on vocational/community based education, presumably allowing the Board to decide the appropriate number of hours," G.M. had not attained his goal of increased community-based programming.

Again, the record does not bear out the district court. At the April 1996 PPT meeting, Garrison asked the team to change G.M.'s IEP to make it a "community-based educational program." The plan that Futures proposed in May emphasized "real-life learning opportunities within [G.M.'s] community." [2] At the next meeting of the PPT, in June, the Board proposed an "adaptation" of the Futures proposal that increased G.M.'s hours of community-based programming to fifteen per week, but kept slightly over fifteen hours of in-school instruction. It was at this point that Garrison requested a hearing. When Futures conducted its evaluation of G.M. in October, its first recommendation was "[a]n alternative, community-based school program." By February 1997, Futures was providing all of G.M.'s educational services, and none of G.M.'s program took place in a school setting. Thus, the record is clear that G.M. accomplished his goal of obtaining a community-based educational program.

The Board contends that G.M. nonetheless did not prevail, because the PPT's adoption of Futures' recommendations "merely continued its existing policy of, first, retaining Futures to evaluate and provide services for G.M.; and second, to accept Futures' recommendations, conditioned on sufficient supporting information." The Board does not explain, however, why the PPT chose not to adopt

Futures' recommendations in their entirety at its June 1996 meeting, but then changed its mind in the fall, after the hearing. Instead, the Board contends only that "it was foreseeable prior to the request for due process that Futures' recommendations would be followed [when Futures produced] sufficient supporting information." But whether the PPT's eventual adoption of Futures' community-based programming was "foreseeable" is not the relevant inquiry, which is, instead, whether G.M.'s request for an administrative hearing was a "materially contributing factor" in the change to his IEP, *Wheeler*, 950 F.2d at 132.

Denying attorney fees under these circumstances would impose excessively onerous burdens on litigants seeking fee awards, so that virtually anything less than perfect congruence between the relief requested and the relief obtained would defeat a fee award. Such an approach clearly contradicts the "generous formulation" of the prevailing party test that the Supreme Court set forth in *Texas State Teachers Association. See* 489 U.S. at 792, 109 S.Ct. 1486.

Furthermore, accepting the district court's standard would deleteriously discourage settlement of claims that are subject to fee-shifting provisions. In settling a lawsuit, each party inevitably makes some concessions. Interpreting the prevailing party standard to require total victory creates an undesirable incentive for litigants not to settle, because, under such a harsh standard, litigants would lose an opportunity to recover their fees whenever they compromised their position even slightly. The more flexible approach enunciated in our precedents greatly lessens such disincentives.

---

2.  One provision of the plan called for 20–25 hours per week of one-on-one instruction. There is no indication, however, that Garrison's demands to the PPT were ever phrased in terms of specific numbers of hours. The

district court therefore erred in concluding that the lack of specific hours in the Futures recommendations that were adopted after the hearing means that G.M. did not prevail.

### 3. Fee Award

■ Having concluded that G.M. "has crossed the 'statutory threshold' of prevailing party status," *Texas State Teachers Ass'n,* 489 U.S. at 789, 109 S.Ct. 1486, we remand to the district court for a determination of the amount of fees and costs that he should recover. As we recently reaffirmed in *Quaratino v. Tiffany & Co.,* 166 F.3d 422 (2d Cir.1999), the district court's analysis should follow the "lodestar" approach, whereby an attorney fee award is derived "by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate," *Blanchard v. Bergeron,* 489 U.S. 87, 94, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989). *See also Jason D.W. v. Houston Indep. Sch. Dist.,* 158 F.3d 205, 208 (5th Cir.1998) (per curiam) (noting, in an IDEA fee award case, the use of the lodestar approach); *Beard v. Teska,* 31 F.3d 942, 945 (10th Cir.1994) (same). In cases of this sort, "[t]here is ... a strong presumption that the lodestar figure represents a reasonable fee." *Quaratino,* 166 F.3d at 425 (internal quotation marks omitted). Included in the award should be not only the time spent on the administrative proceeding, but the time expended on this suit (including this appeal) as well. *See id.* at 428.

We leave to the district court to determine whether G.M.'s fee award should encompass the supplementary administrative hearing held at G.M.'s request in April 1997. The district court, having found against G.M. on the threshold issue of whether he was a prevailing party in the administrative proceeding, did not reach this issue. G.M. depicts the hearing as a successful action to enforce the order issued in the original hearing, while the Board contends that the hearing officer largely rejected G.M.'s asserted grievances. We are unable to ascertain from the record before us precisely what transpired prior to and during the supplementary hearing, and so think it best to allow the district court to resolve this dispute.

## CONCLUSION

We hold that the district exceeded its discretion in finding that G.M. did not prevail in the administrative proceedings challenging the adequacy of his individual education plan. We remand for a determination of the amount of fees that G.M. should recover.